Roy P. BOUCVALT, M.D.,
Plaintiff-Appellee,
Cross-Appellant,

v.

BOARD OF COMMISSIONERS OF HOSPITAL SERVICE DISTRICT NO. 1, IBERIA PARISH, et al., Defendants-Appellants, Cross-Appellees.

No. 85–4670.

United States Court of Appeals, Fifth Circuit.

Aug. 27, 1986.

Eric W. Springer, Horty, Springer & Mattern, James C. McManus, Pittsburg, Pa., Roy, Forrest & Lopresto, Leon E. Roy, Jr., New Iberia, La., for defendants-appellants, cross-appellees.

R. James Kellogg, New Orleans, La., for plaintiff-appellee, cross-appellant.

Before CLARK, Chief Judge, RUBIN, and GARZA, Circuit Judges.

CLARK, Chief Judge:

Roy P. Boucvalt brought this action under 42 U.S.C. § 1983 against Donald Hebert, Executive Director of Iberia General Hospital (IGH), and the Board of Commissioners (the Board) of Iberia Parish Hospital Service District No. 1 (the district). Dr. Boucvalt sought damages and injunctive relief for violations of his rights under the First and Fourteenth Amendments to the United States Constitution. He also asserted pendent state law claims for breach of contract and intentional infliction of mental distress. The district court found for defendants on all claims except breach and awarded Boucvalt $287,785.00 in compensatory damages. Defendants appeal from the judgment against them. Boucvalt cross appeals, arguing that the district court erred in finding that he was not deprived of his procedural due process rights in the termination of his contract and in the issuance of a reprimand to him. He seeks to have the reprimand vacated and to be awarded attorney fees under 42 U.S.C. § 1988. We affirm the district court on all issues.

I

Construed most favorably to the findings of the district court, the record discloses the following facts. Boucvalt and Robert Miller, both anesthesiologists, entered into a contract on March 3, 1980 with the district to provide anesthesia services to IGH through June 30, 1983. In April 1981, Mil-

ler assigned his portion of the contract to Boucvalt in writing and terminated his relationship with IGH.

In May 1981, Donald Hebert became Executive Director of IGH. Hebert wanted to renegotiate the anesthesia contract because he felt that the compensation being received by the anesthesiologists was too high. Hebert sent a letter to Boucvalt stating that failure to reapply for staff privileges at IGH automatically terminated the contract and proposing that a new contract be negotiated. Boucvalt, however, maintained that the original contract remained effective.

In response, Hebert conceded that the anesthesia contract remained in effect. He also informed Boucvalt that commencing January 1, 1982, Boucvalt would be directly accountable to the Executive Director. Prior to that time, according to Hebert, Boucvalt had not been directly accountable to the Executive Director.

Section 11 of the anesthesia contract provided:

It is agreed that both the Administrator and the Anesthesiologists shall determine questions of policy. No departmental directives shall emanate unless approved by both the Administrator and the Anesthesiologists.

However, the Organizational Chart of the Department of Anesthesiology showed that the chief anesthesiologist was subordinate and accountable to the Executive Director.

In addition to his general positions on compensation and accountability, Hebert had a number of specific concerns about Boucvalt's performance, which he communicated to him in the December 1981 to January 1982 period. In one incident, Boucvalt and an attending physician disagreed about the appropriate type of tracheal tube to be utilized in children during surgical procedures. Hebert instructed Boucvalt that it was the attending physician's decision and that he was not to dispute the physician's choice. In other communications, Hebert questioned the adequacy of Boucvalt's insurance coverage and whether he had properly documented all pre-anesthesia visits of patients.

On April 21, 1982, Boucvalt's counsel advised the Board that Boucvalt felt that the situation created by Hebert's criticisms was intolerable. The attorney listed five proposals to satisfy Boucvalt's grievances. Proposal 3 was that:

[Boucvalt] be placed under the control and authority of the Hospital Board of Commissioners and not answerable to Mr. Hebert for matters concerning his employment with the hospital and the Anesthesia Department.

In reply, the Secretary of the Board informed Boucvalt that the Board had rejected all five of his proposals. The reply also stated that Boucvalt was under contract and was considered answerable to the Executive Director.

Another incident occurred around this time. Dr. James Falterman filed a complaint against Boucvalt with the Medical Staff Executive Committee. The Committee sent a letter to Boucvalt informing him of the complaint and asking him to attend a meeting two days later to discuss the complaint. The letter did not specify the nature of the complaint or the names of the patients involved.

At the beginning of the Executive Committee meeting, Boucvalt was told that it was customary for the accused physician to leave the room while the complaining physician voiced his complaint. Boucvalt then left the room. Upon his return, he was informed that he was accused of having departed the operating room during five operations over the past five months. Boucvalt explained that his behavior had been proper because he had been in an adjoining suite where he could maintain visual contact with the certified nurse anesthetist at all times during the operation. Nonetheless, Boucvalt was subsequently reprimanded by a letter from the Executive Committee for his absence during most of one particular operation performed by Falterman.

Boucvalt's attorney requested the Board to rescind the Executive Committee's repri-

mand because it was issued in violation of due process. The Board, however, refused to consider this request because established procedure required Boucvalt to seek reconsideration directly from the Executive Committee. The Board advised Boucvalt that it also felt that the reprimand was carried out with due process.

Meanwhile, the Board of Commissioners requested Boucvalt's attendance at its meeting on June 24. The principal concern of the Board was Proposal 3 of the letter sent by Boucvalt's counsel to the Board. During the June 24 meeting several Board members expressed to Boucvalt the view that he, like other physicians, was answerable to the Executive Director. Boucvalt, however, maintained that, under his contract, policy setting was a joint responsibility of the Executive Director and the anesthesiologist and that therefore he was not required to take directions from Hebert. The meeting concluded with these conflicting positions articulated but unresolved.

Following this meeting another dispute arose between Hebert and Boucvalt. Hebert stated that the Joint Commission on Accreditation of Hospitals (the Commission) guidelines required Boucvalt to provide continuing education sessions for nurse anesthetists. Boucvalt refused to accept Hebert's position and maintained that such sessions were not necessary.

Boucvalt attended a July Board meeting, at which he stated that he could only remain at IGH if all five proposals in the April 21 letter were met. After this meeting, the Chairman of the Board sent a letter to Boucvalt requesting confirmation of Boucvalt's categorical refusal to be accountable to the Executive Director. Boucvalt responded by stating that he had "never categorically refused to be accountable to the Chief Executive Officer of Iberia General Hospital except in the context" of Proposal 3.

On July 26 the Board informed Boucvalt that it was terminating the anesthesia contract on the ground that his refusal to be accountable to the Executive Director rendered the contract impossible to perform.

Upon receiving this letter, Boucvalt withdrew from medical staff membership at IGH and sought employment elsewhere. He accepted a position in Rocks Springs, Wyoming and commenced work in November.

## II

Defendants argue that Boucvalt's refusal to be accountable to the Executive Director justified the termination of the anesthesia contract because the refusal constituted an active breach of the contract which relieved the Board of its obligations under the contract, *Andrew Development Corp. v. West Esplanade Corp.*, 347 So.2d 210, 212–13 (La.1977), and rendered the contract impossible to perform. This theory can be sustained only if the refusal to be so accountable was in fact a breach of contract under Louisiana law.

A preliminary question concerns the standard of review to be followed. The district court found that the refusal to be accountable was not a breach of contract because it was justified by Section 11 of the contract. However, the court did not indicate whether it found the language of Section 11 clear and unambiguous, in which case its interpretation is reviewed as a matter of law, or whether it relied on extrinsic evidence in interpreting Section 11, in which case its interpretation is reviewed under the "clearly erroneous" standard. *Makofsky v. Cunningham*, 576 F.2d 1223, 1229 n. 7 (5th Cir.1978). Since the court did not cite any extrinsic evidence in support of its interpretation, however, it appears that it found the language of Section 11 clear and unambiguous.

■ Section 11 states that policy is to be made by *both* the Administrator (i.e., the Executive Director) and the anesthesiologists and that "[n]o departmental directives shall emanate unless approved by both the Administrator and the Anesthesiologists." This language clearly means that the Executive Director cannot make policy or issue directives relating to the anesthesia department without the approv-

al of the anesthesiologists. The anesthesiologists are not required to accede to the instructions or demands of the Executive Director. Section 11 therefore justified Boucvalt's refusal to be subordinate or accountable to the Executive Director.

The Board argues that Section 11 applies only to the making of departmental, as opposed to hospital-wide, policy. The problem with this position is that it is irrelevant to the facts of this case. Virtually all of the disputes between Hebert and Boucvalt which gave rise to Boucvalt's refusal to be accountable involved policy relating to the anesthesia department, such as Boucvalt's insurance coverage, the documentation of pre-anesthesia visits and the continuing education requirements of nurse anesthetists. The Board points to no evidence that Boucvalt's refusal to be accountable to the Executive Director extended to matters not relating to the anesthesia department.

■ More fundamentally, even if Boucvalt's proposals or demands went beyond what was guaranteed by his contract, we cannot find such a "definitive refusal to perform" on Boucvalt's part as to justify the Board in treating the contract as anticipatorily repudiated. *See Andrew Development Corp.*, 347 So.2d at 213. This is particularly true in light of the fact that the Board sought to go beyond its rights by requiring Boucvalt to be accountable to the Executive Director on all matters and that the Board based its termination of the contract on Boucvalt's refusal to be so accountable.

The Board relies on a variety of regulations and standards relating to hospital accreditation and management to support its interpretation of the contract. For example, the Commission states:

> The governing body shall hold the chief executive officer responsible for the implementation of established policies in the operation of the hospital; for providing adequate information to the governing body regarding hospital operation and federal, state, and local developments that may affect these operations; and for enhancing liason among the gov-

erning body, medical staff, and administration.

Joint Commission on Accreditation for Hospitals, *Accreditation Manual for Hospitals*, Governing Body Interpretation to Standard VII, p. 55 (1981 ed.). Similarly, the Board points to federal and state regulations, and the hospital's own constitution, which require the appointment of a chief executive officer with the power to manage the hospital.

■ At most, however, these materials show that the anesthesia contract was unwise in allowing the anesthesiologists an equal policy role with the Executive Director. They do not show that the contract would lead to such absurd consequences that the clear and unambiguous words of the contract may be disregarded. *Compare Makofsky*, 576 F.2d at 1229–30, *with Chevron U.S.A., Inc. v. Belco Petroleum Corp.*, 755 F.2d 1151, 1153–54 (5th Cir.) *cert. denied,* — U.S. ——, 106 S.Ct. 140, 88 L.Ed.2d 116 (1985). It cannot be considered absurd for the contract to require the Executive Director and the anesthesiologists to agree on matters of policy and, if they are unable to resolve any disputes, to seek a final decision from the Board.

■ Furthermore, if extrinsic evidence was considered in interpreting the contract, we could not ignore the strong evidence which supported Boucvalt's interpretation. Hebert's letter to Boucvalt in December 1981 stated that Boucvalt would be accountable to Hebert "effective January 1, 1982." This statement implies that Boucvalt was not accountable to the Executive Director prior to that time and that therefore the contract did not mandate such accountability. Indeed, Hebert testified at trial that the contract did not require Boucvalt's accountability. Thus, even if extrinsic evidence was considered, the district court's conclusion that the contract did not require accountability would not be clearly erroneous.

For these reasons we conclude that the contract did not require Boucvalt's accountability to the Executive Director. The

Board's termination of the contract was therefore without excuse and Boucvalt was entitled to the award of damages for breach of contract.

## III

Boucvalt contends that the Board deprived him of a liberty interest without due process when it upheld the action of the Medical Staff Executive Committee that issued him the written reprimand. The district court denied Boucvalt's claim on the grounds that the reprimand did not deprive Boucvalt of a constitutionally protected liberty interest and that the Board was not responsible for the reprimand.

■ It is unnecessary to decide whether the reprimand deprived Boucvalt of any constitutionally protected liberty interest. *See, generally, Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). It is also unnecessary to decide whether the procedures followed by the Medical Staff Executive Committee in issuing the reprimand met minimal due process requirements. The Executive Committee is not a party to this lawsuit. As Boucvalt concedes, the Board cannot be held vicariously liable under 42 U.S.C. § 1983 for the unconstitutional acts of the Executive Committee.

Boucvalt contends, however, that the Board "ratified" the allegedly unlawful acts of the Executive Committee when the Board refused to vacate the reprimand and stated that the reprimand was issued with due process. The single authority for the proposition that the Board's "ratification" of the Executive Committee's acts renders it liable under section 1983 is *Williams v. Thomas,* 511 F.Supp. 535, 540 (N.D.Tex. 1981). *Williams,* which deals with the liability of a sheriff under Texas law when he ratifies or authorizes the tortious acts of his deputies, is irrelevant to this case.

■ Assuming, however, that the Board could be liable for ratifying the acts of the Executive Committee, we see no basis for finding any such ratification here. The Board informed Boucvalt's attorney that it "declined to consider Dr. Boucvalt's request for action rescinding the reprimand invoked against him by the Medical Staff Executive Committee." The basis for this refusal was that established procedure required Boucvalt to appeal the reprimand to an appointed appellate review committee, not to the Board. Boucvalt does not challenge the district court's finding that under the Medical Staff Bylaws the Board was not in fact the proper body to review the decision of the Executive Committee.

It is true that the Board also expressed its opinion that the reprimand had been issued with due process. There is no evidence, however, that the Board would have vacated the reprimand had its opinion been that Boucvalt's due process rights had been violated. The request to vacate the reprimand should have been made to the proper review body. The Board's opinion that due process had been observed did not ratify the Executive Committee's actions or violate any of Boucvalt's substantial rights.

## IV

■ The final issue in this case is whether the Board's termination of Boucvalt's contract violated his right to procedural due process. Under the Constitution of the United States, the State of Louisiana may not deprive an individual of a protected property interest without adherence to minimal due process standards. *Findeisen v. North East Independent School District,* 749 F.2d 234, 237 (5th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985). As a government entity, the actions of the Board constitute state action under section 1983.

The procedures afforded Boucvalt for the protection of his contract rights may be summarized as follows. First, Boucvalt was invited to and attended two Board meetings at which he was informed of the Board's strong concern about and opposition to his refusal to be accountable to the Executive Director. Boucvalt had an opportunity to explain and did explain the contractual basis of his refusal to be ac-

countable. Thus, the basic facts and legal positions of the parties were clearly established at these meetings.

Second, by letter, the Board gave Boucvalt a final opportunity to clarify or change his position with respect to the dispute. Third, Boucvalt was informed in writing of the termination of the contract and the reasons for it. Fourth, Boucvalt had a breach of contract remedy under Louisiana law for violation of his contract rights. This remedy, of course, entitled Boucvalt to the full benefits of an adversary trial. As a result of Boucvalt's utilization of the Louisiana breach of contract remedy he received an award of $287,-785.00 in damages for the Board's breach of the contract.

Boucvalt certainly is not a victim of arbitrary or unfair treatment by the State of Louisiana. Rather, he is a party to an ordinary contract who contends that the other party to the contract is in breach. If the other party were a private citizen, Boucvalt would be entitled to no more than to sue for breach of contract. This is an adequate remedy to protect Boucvalt's rights and to compensate him for his damages. Simply because his contract is with a public body, however, Boucvalt claims that he was constitutionally entitled to some sort of formal hearing *before* the contract was terminated. That such a hearing be required before any public agency can ever terminate or breach a contract is unrealistic and contrary to common sense. *See Findeisen,* 749 F.2d at 240–41 (concurring opinion of Garwood, J.). Unfortunately, that does not end our analysis. *Id.*

The Supreme Court has held that the Due Process Clause "requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (citing *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 599,

92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972) ). In *Loudermill,* the Court considered what pretermination process was due the plaintiffs there, a security guard and a bus mechanic, both of whom were employed by public agencies. The Court concluded that the plaintiffs were entitled to notice and an opportunity to respond before being discharged. *Loudermill,* 105 S.Ct. at 1495.

Like *Loudermill, Roth* and *Sindermann* involved a particular type of contract, i.e., the employment of a tenured public employee who could be fired only for cause. The *Roth* and *Sindermann* contracts were only for personal services, were not highly compensated and were indefinite in duration. There are a number of factors which support a predeprivation hearing requirement where these contracts are involved. First, such public employees have an extremely strong interest in not being deprived of their means of livelihood. *Loudermill,* 105 S.Ct. at 1494. They are unlikely to be persons of independent means. *See Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). Second, tenured employees have an expectation of permanent employment, *see Vail v. Board of Education,* 706 F.2d 1435, 1451 (7th Cir.1983) (dissenting opinion of Posner, J.), *aff'd by an equally divided Court,* 466 U.S. 377, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984) and may not receive adequate compensation through an action for damages. Furthermore, "[w]hile a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Loudermill,* 105 S.Ct. at 1494. Finally, the employee who may be terminated for cause has a special need to "invoke the discretion of the decisionmaker," i.e., the employer. *Id.*

These factors do not support a requirement of predeprivation process in every contract case, however. The present case involves a negotiated contract where the "employees" undoubtedly had enough bargaining power to have attained a contractual right to a pretermination hearing, if they

believed one necessary. This was not a simple employment contract but a contract of two highly trained and very highly compensated doctors for the provision of anesthesia services to a hospital. The contract required the anesthesiologists to provide not only their own personal services but to supervise others and to manage the department. Under some circumstances, the anesthesiologists were required to hire other anesthesiologists at their own expense.

■■■ While termination of the contract deprived Boucvalt of a lucrative source of income, it did not deprive him of his means of livelihood. He retained his medical staff privileges and therefore was still able to work at the hospital. Moreover, the contract was not unlimited in duration; indeed, it was to last less than one additional year from the date that it was terminated. Boucvalt's breach of contract remedy fully compensated him for the loss of the contract during this time. Finally, a formal hearing before the Board would have served no special purpose. The only issue that separated the parties was the well-ventilated question of whether Boucvalt had a contractual right to refuse to be accountable to the Executive Director; this is not a matter about which the Board or Boucvalt had any discretion or particular expertise beyond what they had exhausted. The proper decisionmaker in this case was a court of law, not the Board. *See Vail,* 706 F.2d at 1454 (dissenting opinion). For all of these reasons, we hold that no predeprivation process was required.

Our conclusion is supported by *Northeast Georgia Radiological Association v. Tidwell,* 670 F.2d 507 (5th Cir.1982). In that case the plaintiff, a radiologist, applied for and received medical staff privileges at a hospital. Subsequently, he contracted with the Hospital Authority to provide the hospital with exclusive radiological services. After another radiologist offered to provide full time radiology services, the Hospital Authority voted to terminate the plaintiff's contract. Furthermore, the plaintiff's medical staff privileges were withdrawn. Relying on the contract and the medical staff by-laws, the court determined that the plaintiff's due process rights were violated when he was deprived of his *medical staff privileges* without any pretermination process. *Id.* at 511. The court, however, did not suggest that any hearing was required before termination of the contract itself. In the case at bar, of course, only the contract was terminated, Dr. Boucvalt was not deprived of his medical staff privileges.

We decline to apply the predeprivation hearing requirement of *Loudermill/Roth/Sindermann* so as to federalize all contract law. *See Casey v. Depetrillo,* 697 F.2d 22, 23 (1st Cir.1983); *Findeisen,* 749 F.2d at 240–41 (concurring opinion); *Vail,* 706 F.2d at 1456 (dissenting opinion). In the present case, the traditional postdeprivation contract remedy constitutes all the process that was due. *Cf. Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981) (holding that postdeprivation tort remedy constitutes all the process that is due for unauthorized negligent and intentional torts by state officials).

■■■ If Boucvalt was entitled to some pretermination process in this case, the pretermination process he received met minimal constitutional standards. Boucvalt had notice of the Board's position and an opportunity to respond. *Loudermill,* 105 S.Ct. at 1495. He was fully informed of the Board's position that he was contractually required to be accountable to the Executive Director. He attended two Board meetings where he explained his reasons for believing that the contract did not make him accountable to the Executive Director. There was no factual issue in dispute. The Board simply interpreted the contract differently from Boucvalt. Even assuming that extrinsic evidence was relevant to the question of interpretation, *see* section II, *supra,* due process does not require a full evidentiary hearing prior to termination. *Id.* at 1495–96.

731

Boucvalt's procedural due process rights were not violated in this case.

### V

For the foregoing reasons we find that Boucvalt was entitled to the award of damages for breach of contract under Louisiana law. He was not entitled to attorney fees or injunctive relief under federal law because he was not deprived of any constitutional right to due process. The district court's judgment is in all respects

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, concurring:

I join in Parts I and II of this opinion and concur in the result reached in Part III. Because, even if Boucvalt had a constitutional right to procedural due process, he was accorded all the process due him under the constitution, I would not discuss the other questions.