ELSAG BAILEY, INC. d/b/a Bailey
Controls Co., Plaintiff,

v.

CITY OF DETROIT, MICHIGAN, Thomas J. DeRiemaker, and Westin Engineering, Inc., Defendants.

and

CITY OF DETROIT, MICHIGAN, Third–Party Plaintiff/Counter–Plaintiff,

v.

AMERICAN HOME ASSURANCE COMPANY, a foreign corporation, Third–Party Defendant.

No. 96–CV–70623.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 29, 1997.

Jeffrey G. Heuer, Jaffe, Raitt, Heuer & Weiss, Detroit, MI, Steven G. Feirson, Aaron C.F. Finkbiner, III, Dechert, Price & Rhoads, Philadelphia, PA, for Plaintiff.

Thomas M. Keranen, Walter J. Federlein, Peter J. Cavanaugh, Federlein & Keranen, P.C., Bloomfield Hills, MI, for Defendant City of Detroit/DeRiemaker.

Michael L. Harrison, Harrison & Kaylor, San Jose, CA (Kevin J. Gleeson, Thomas L. Auth, Jr., Sullivan, Ward & Bone, Southfield, MI, of counsel), for Defendant Westin.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. *BACKGROUND*

When this suit was filed on February 9, 1996, the complaint raised issues only of breach of contract and common law tort liability. On December 30, 1996, plaintiff Elsag Bailey, Inc. (Bailey) sought and later obtained permission to file an amended complaint. It was in this amended complaint that Bailey, for the first time, raised due process issues.

In conferences with counsel, it became clear that when both the complaint and amended complaint were analyzed, three issues predominated: (1) the defense of immunity raised by the City of Detroit (City) to the common law tort claims; (2) the issues relating to the alleged deprivations of due process; and (3) the issues involved in the breach of contract claims.

It seemed to me that the posture of this case, as these issues surfaced, required the use of Fed.R.Civ.P.42(b). It provides:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

I utilized this approach in dealing with Bailey's common law tort claims in its complaint, countered by the defendants' motion to dismiss those claims on statutory immunity (*See* my Opinion and Order dated June 17, 1997).

In like fashion, I then directed that the parties consider with me Bailey's assertion of due process duties imposed on defendant City of Detroit as raised in Bailey's amended complaint. I clarified for the parties how these issues could be addressed under Rule 42(b). Bailey expressed an understandable concern; and that is that, contending as it did that these due process rights had factual content, i.e., there were issues of fact that precluded the use of Rule 42(b)'s purposes. This contention is without merit; in an exploration of the issues, I would only decide the legal issues and would reserve factual issues, if any, for jury trial.

Counsel for both parties seem somewhat mystified by the use of Rule 42. They view the proceedings akin to motion practice.

This issue has been fully tried. Testimony through depositions and numerous exhibits was received. Argument, almost excessive at times, was followed by hearings and the filing of multiple briefs.

Bailey's counsel has argued throughout that the due process issues should be submitted to a jury. But, I conclude that the issue is a legal issue and that a jury trial is not required. Accordingly, the opinion that follows are my findings and conclusions to a matter fully tried.

Bailey's chief contention is that because the City, as a governmental agency acting under color of state law, entered into a contract with it, that relationship imposed duties on the City to afford Bailey due process in a pre-termination hearing before it declared Bailey to be in default of its contract, PC–665. For Bailey to clinch its point, it had to demonstrate that it had a protectable property or a liberty interest that required due process and, thus, an action under Title 42 U.S.C. Section 1983.

We have here a commercial contract entered into by a governmental unit and a contractor. While it might be argued that absent the contractual provisions hereinafter referred to there might be a right to due process, any claim that such right exists in this case is derived from the contract. Several sections in the contract are noteworthy.

Section 3.4.2 of the General Conditions provides:

> Before the Owner shall exercise its right to declare the Contractor in default by reasons of conditions set forth in Article 3.4.1 above, the Engineer will provide the Contractor and Surety written notice of the Owner's intent and the ground or grounds thereof and designate a mutually agreeable [time] at which the Contractor will be given an opportunity to be heard before the Board of Water Commissioners.

Section 3.4.10 of the General Conditions provides:

> After notice of the termination of the Contractor's right to proceed, if it is determined for any reason that the Contractor was not in default or that the delay was excusable, the rights, obligations and relationships of the Owner and Contractor shall be the same as if the notice of termination had been issued pursuant to Article 14.1.

Section 14.1 of the General Conditions provides in pertinent part:

> In addition to the other conditions, provisions and terms provided in the Contract Documents, the owner shall have the right to terminate, for convenience, the performance of Work and the Contract, in whole or in part, whenever the Owner shall determine that such termination is in the best interests of the City of Detroit. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of Work under the Contract is terminated, and the date upon which such termination becomes effective.

## II. *INTRODUCTION OF THE ISSUE*

As detailed in my June 17, 1997 Opinion and Order, the present dispute arises out of the negotiation, performance and alleged breach of a contract, PC–665, between Bailey and the City. Bailey filed its original complaint on February 9, 1996, alleging various common law tort and contract claims. Ten months later, it moved to amend its complaint to state due process claims. On March 26, 1997, I granted it leave to amend its complaint to allege claims under 42 U.S.C. Section 1983.

Bailey's alleged Section 1983 factual claims begin with a scheme on the part of defendant Westin Engineering, Inc. (Westin) and the Detroit Water and Sewerage Department (DWSD) to blame Bailey for Westin's shoddy workmanship on another contract related to Contract PC–665. According to Bailey, Westin had well-placed friends within the DWSD who were willing to misrepresent the quality of Westin's work. Bailey claims that Westin and the City concocted misrepresentations. to induce Bailey into contract PC–665 at a much cheaper price.

Bailey's Section 1983 claims are not limited to the actions of defendants occurring during the negotiation of PC–665. It asserts that the Project Engineer for PC–665, Thomas DeRiemaker (DeRiemaker), furthered the conspiracy between Westin and DWSD by unjustly refusing to approve change orders that Bailey requested. The City responds that DeRiemaker's refusal to approve change orders was based on a legitimate dispute over the interpretation of terms in the contract.

According to the City, the differing interpretations were fully "ventilated" by the parties in a series of letters written in the spring and summer of 1995 and again during settlement talks in the fall of 1995.

Bailey takes a dark view of the letters it received during this period. It says that the

letters it received from DeRiemaker and DWSD Director, Stephen Gorden (Gorden), evidence the City's longstanding desire to declare Bailey in default and to relet the contract we now know as PC–665 to another entity.

DeRiemaker appears to have written the first letter. On May 25, 1995, he outlined DWSD's "serious concerns" about Bailey's performance on PC–665. He warned that if five specific concerns were not addressed "the result could be a default by Bailey Controls Company."

Bailey's Chief Operating Officer, Gabriel Rosica (Rosica), responded to Gorden and the Board of Water Commissioners (the Board) on June 23, 1995. He set forth what Bailey believed to be "the open issues relating to" PC–665 and Bailey's "serious concerns as to the City's interpretation of" it.

Another letter from Gorden followed on July 10, 1995 informing Bailey that, although DWSD was "prepared to have [the June 23, 1995] communication addressed by the Board as presented," PC–665's claims process required that submission of claims be first presented to DeRiemaker as a condition precedent to Board action. Gorden expressed his opinion that the failure to follow the proper procedures made it "doubtful" that the Board would take "meaningful action" on Bailey's letter at that time. The letter went on, however, to invite further discussion of the "open issues" under the contract. Gorden, in fact, suggested that DWSD executives would attend such a meeting.

Gorden followed his July 10, 1995 letter with another letter on July 21, 1995 which expressed the view that "the Commissioners, although laypeople [sic], are nevertheless an intelligent group of professionals that have grown cynical, over time, when confronted by a contractor's pleas for equitable treatment." The letter discussed Gorden's concerns about PC–665's potential "demise." The letter again offered Bailey the chance to meet with Gorden to discuss "alternatives." Gorden said that he would "gladly clear [his] calendar for such a meeting and make the appropriate people available."

On August 15, 1995, DeRiemaker sent Bailey the review of its June 23, 1995 letter to the Board that Gorden had promised earlier in the summer. DeRiemaker attempted to "set the record straight" by examining a number of issues allegedly not mentioned in Rosica's June 23, 1995 letter. While DeRiemaker also detailed a number of other objections that DWSD had to Bailey's work under PC–665, he stated that "We do not expect they [i.e., members of the Board] will take any unilateral actions to address the issues conveyed in your letter."

The discussion of issues that began with this series of letters apparently clarified the disputes sufficiently to allow the parties to move toward a settlement. On October 30, 1995 the parties entered into a Memorandum of Understanding (MOU) that would serve as a blueprint for a formal settlement agreement. The specific provisions of the MOU clearly reflected both sides' willingness to compromise on their initial stances.

This willingness, however, was short-lived. By January 31, 1996, it was clear to DeRiemaker that the MOU was not going to produce its intended resolution. On that day, DeRiemaker sent Rosica a letter requesting that, within 15 days, Bailey either submit a written action plan for completion of PC–665 or a written confirmation that Bailey did not intend to complete the work. The letter warned that, "if BCCo [Bailey] did not complete the work, DWSD must formally declare BCCo to be in default of the contract, and then terminate BCCo for just cause."

Bailey's response was swift. On February 9, 1996, Bailey filed the present lawsuit with a forty-nine page, twelve-count complaint which alleged, inter alia, that the City "prevented Bailey from performing and has repudiated and/or constructively terminated the contract." See Original Complaint at ¶ 95. On the same day that it filed its complaint, Bailey responded to DeRiemaker's January 31, 1996 letter and reiterated its position as stated in its complaint that the City's various actions constituted a breach of PC–665 and it put the City on notice that Bailey was ceasing performance and pursuing its legal remedies in this court.

DeRiemaker replied on Wednesday, February 21, 1996[1] and informed Bailey that the Board of Water Commissioners was going to take "formal action" to declare Bailey to be in default of PC–665 in a hearing scheduled for February 28, 1996. The letter stated:

> Pursuant to General Condition 3.4.2 of the Contract, Bailey will be afforded the opportunity to be heard before the Board of Water Commissioners, on February 28, 1996, *prior to the Board taking any action on the declaration of default.* (Emphasis added.)

The letter required Bailey to submit any written materials it intended to submit for Board review by Monday, February 26, 1996.

Bailey's Group Vice–President and General Counsel, Mark Santo (Santo), answered DeRiemaker's letter on February 26, 1996 by flatly refusing to attend the hearing that DeRiemaker had offered. Santo wrote:

> "We will not attend your hearing because DWSD has breached and terminated Contract PC–665, and procedures under a terminated contract have no meaning."

Santo then referred DeRiemaker to the original complaint for an explanation why "DWSD breached, abandoned, and terminated Contract PC–665." The parties do not dispute that the default hearing took place as scheduled and that the Board declared Bailey to be in default.

On May 1, 1996, Gorden asked the City Council take formal action to ratify the Board of Water Commissioners' declaration of default. On May 9, 1996, Bailey presented its side, advising City Council of the company's position that DWSD had defaulted, not Bailey. Bailey followed with a similar letter to the City Council on June 19, 1996, the day that Council formally approved the Board's earlier default determination.

In the months between the Board's declaration of default and the City Council's ratification, the parties disagreed as to what should happen to property located in locked offices and a locked trailer that Bailey occupied on DWSD premises. On March 27, 1996, Jeffrey G. Heuer, Bailey's local counsel advised the City of Bailey's position that it was "DWSD's responsibility to safeguard such equipment from damage or theft." On April 24, 1996 and on June 13, 1996, DWSD employees entered the locked areas formally occupied by Bailey and inventoried and possibly moved the property. Bailey claims there were other entries as well.

### III. *ANALYSIS*

I conclude that Bailey cannot pursue its claims under 42 U.S.C. Section 1983; it has no protectable property or liberty interests and, accordingly, no due process rights to pre-termination hearings; nor can it show that defendants violated its right to free speech or its right to be protected against unreasonable searches and seizures. Finally, there is, here, no violation of substantive due process rights.

### A. *Due Process Claims*

The modern notion of a protected property interest began to take shape in the seminal case *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In that case, the United States Supreme Court held that statutory entitlements in the form of welfare benefits constituted a property interest protected by the Fourteenth Amendment. *Goldberg* opened the door to findings of protected property interests in diverse situations.[2]

---

1. Bailey claims that, while the letter was dated February 21, 1996, it did not receive the letter until February 23, 1996.

2. *Reed v. Village of Shorewood,* 704 F.2d 943 (C.A.7 1983) (Property right in the award of a liquor license.); *Signet Constr. Corp v. Borg,* 775 F.2d 486 (C.A.2 1985) (Right to timely payment by government to contractor is a property right entitled to due process protection.); *Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667 (C.A.7 1987) (Right to certification as a minority business enterprise (MBE) is a constitutionally protected property right.); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (Uninsured motorist has a property right to a driver's license.); *Northeast Ga. Radiological Assoc., P.C. v. Tidwell,* 670 F.2d 507 (C.A.5 1982) (Property right in staff privileges at county hospital.); *Three Rivers Cablevision, Inc. v. City of Pittsburgh,* (502 F.Supp. 1118 (W.D.Pa.1980)) (Right of lowest bidder to receive government contract is protected property interest.)

Important "diverse situations" were examined in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In those cases, the Supreme Court held that "property," as that word is used in the due process clause of the Fourteenth Amendment, included benefits conferred by certain contracts with government entities. Both cases happened to involve public employment contracts, but the Court did not limit its holdings solely to instances involving government contracts for public employment. The Court hinted that benefits conferred by other types of government contracts could receive similar protection because protected property interests are "not limited by a few rigid technical forms." *Sindermann*, 408 U.S. at 601, 92 S.Ct. at 2699, quoting *Roth*, 408 U.S. at 571–572, 92 S.Ct. at 2706–2707. "Property," the Court reasoned, includes many interests guaranteed by "existing rules or mutually explicit understandings." *Id.*

While it may be argued that *Roth* and *Sindermann* offer broader due process protection to contractual entitlements, courts of appeals have not so found. In *Brown v. Brienen*, 722 F.2d 360 (C.A.7 1983), the U.S. Court of Appeals for the Seventh Circuit criticized the practice of federalizing disputes traditionally handled by state suits for breach of contract:

> We must bear in mind that the Fourteenth Amendment was not intended to shift the whole of the public law of the states into federal courts.

*Id.* at 364. After discussing the potential problems associated with requiring "federal courts ... to pass judgment on the procedural fairness of the processing of a myriad of contractual claims against public entities," *Reich v. Beharry*, 883 F.2d 239, 242, other courts [3] using similar language have followed

the Seventh Circuit's lead and found no cognizable constitutional claims in cases similar to this case.

Since the U.S. Court of Appeals for the Sixth Circuit has not ruled in this context, cases in other circuits are informative. *S & D Maintenance v. Goldin*, 844 F.2d 962 (C.A.2 1988), the U.S. Court of Appeals for the Second Circuit found that the plaintiff, a contractor with a city was not denied due process, even though it received no notice or opportunity to be heard prior to the city's termination of its contract to provide maintenance of the city's parking meters. The Second Circuit reasoned that, because the contract was terminable at will, any property interest arising out of the contract was nothing "more than an ordinary contract right" not entitled to protection under the due process clause. *Id.* at 966. That court ruled that government contractors invoking the protection of the due process clause must demonstrate that

> procedural protection is sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits.

*Id.* at 966. (Emphasis in original; footnote omitted.) The court refused to extend the holdings of both *Goldberg* and *Roth* "to constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a government contractor." [4]

The U.S. Court of Appeals for the Third Circuit employed similar reasoning in *Unger v. National Residents Matching Program*, 928 F.2d 1392 (C.A.3 1991). *Unger* held that contracts with state entities give rise to protectable property interests under the due

---

**3.** Other circuits have expressed the same concern. *S & D Maintenance Co. v. Goldin*, 844 F.2d 962 (C.A.2 1988), *Walentas v. Lipper*, 862 F.2d 414 (C.A.2 1988), *Boucvalt v. Board of Commissioners*, 798 F.2d 722 (C.A.5 1986), *Reich v. Beharry*, 883 F.2d 239 (C.A.3 1989).

**4.** However, while holding that S & D had no property right to have its services retained throughout the term of the contract, the court

did recognize *in dicta* that S & D had a protectable property right in "not being terminated on the grounds [of] default" because, under the contract, the city could only default S & D for cause. Since the city terminated S & D for convenience, the court did not have to decide whether S & D had been deprived of its property right not to be declared in default without due process of law.

process clause where one of two situations exists: (1) the contract confers a protected status because of extreme dependence (as in the case of welfare benefits) or permanence (as in the case of tenure); or (2) the contract is terminable only for cause.

In *Linan–Faye Construction Co. v. Housing Authority of Camden,* 49 F.3d 915 (C.A.3 1995), the Third Circuit applied *Unger* in a case similar to this case. *Linan–Faye* involved a construction contract between Linan–Faye, a company that entered into a renovation contract with the defendant, Housing Authority of Camden (HAC). Soon after the award of the contract, the parties began to have disputes about the proper interpretation of the contract's specifications. Because the contract contained a termination for convenience clause, the court found that it did not fit in either of the two categories *Unger* had found to create protectable property rights:

> Linan-Faye's contract with HAC does not fall into either of the two categories in *Unger.* The contract does not confer a protected status on the plaintiff and the state entity could terminate the contract for reasons other than for cause. Indeed it could be terminated for convenience. To grant Linan–Faye a remedy under Sec. 1983 would create the wholesale federalization of state public contract law that concerned us in *Unger and Reich.* Accordingly the district court did not err in granting summary judgment for HAC on Linan–Faye's claim.

*Linan-Faye,* 49 F.3d at 932.

■ Bailey attempts to distinguish *Linan–Faye* contending that the City did not terminate contract PC–665 for convenience, but instead declared a default. Citing language from *S & D Maintenance, supra,* Bailey asserts that it has a constitutionally-protected property interest in a pre-termination hearing before being declared in default because the default provision of PC–665 requires that the City provide specific reasons (*i.e.,* cause) for the entry of default.

I do not agree. Bailey has misapplied *S & D Maintenance* to the facts of this case. Bailey fails to acknowledge that Article 3.4.10 of the contract in this case, PC–665, effec-

tively negatives any legitimate expectation that default could be entered only for cause. That provision provides that, if default is entered improperly "for any reason," the default is automatically transformed into a termination for convenience. In my view, this provision vitiates Bailey's right to a due process hearing. Even if Bailey were correct in contending that the City improperly defaulted it—an issue that this opinion does not address—the right to a default *only* for cause is not securely held and, therefore, is not a property right protected by the due process clause of the Fourteenth Amendment.

■ My conclusion that Bailey has no protectable property interest, however, does not end the inquiry whether Bailey suffered a deprivation of due process. Bailey also claims that the City violated its constitutionally-protected liberty interest by injuring Bailey's good name with its declaration of default and by retaliating against Bailey for filing suit.

Bailey's argument that the City retaliated against it and declared it in default because it filed suit on February 9, 1996 is a curious one. To begin with, Bailey argues that Gorden "admitted that DWSD declared Bailey in default in retaliation for Bailey's filing of the lawsuit." Third Supplemental Brief at 12. But that portion of Gorden's deposition that Bailey cites in support of this argument says nothing about retaliation. It merely discusses when it was that Gorden formed his own opinion about the merits of Bailey's position. Moreover, Bailey's argument that the City declared its default in retaliation for Bailey's filing suit irreconcilably conflicts with its argument that the decision of the City to default Bailey came months before Bailey filed suit.

Bailey's argument that it suffered a deprivation of its liberty interest because the declaration of default damaged its good name is similarly flawed. Bailey cites the seminal decision of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), as support; but far from supporting Bailey's position, *Paul* clearly undermines it. *Paul* held that:

The words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

*Id.* at 701, 96 S.Ct. at 1160–1161.

Bailey argues that the damage it suffered is not simply reputational. Bailey asserts that it is the damage to its reputation coupled with the attendant loss in business and the ability to bid on other government contracts that creates the "tangible interest" giving rise to Fourteenth Amendment protection. However, the Supreme Court made it clear that these additional tangible interests

attain [ ] constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status.

*Id.* at 710–711, 96 S.Ct. at 1165. (Footnote omitted.)

In this case, Bailey can point to no law that protects its "status" as a bidder on contracts or provider of services. A contrary conclusion

would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever system may already be adminis-

tered by the States. We have noted the "constitutional shoals" that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law. . . .

*Id.* at 701, 96 S.Ct. at 1160. (Citation omitted.)

Bailey cites *Mertik v. Blalock,* 983 F.2d 1353 (C.A.6 1993) for the proposition that "when a plaintiff alleges the loss, infringement or denial of a governmental right or benefit previously enjoyed by him, coupled with communications by government officials having a stigmatizing effect, a claim for deprivation of liberty without due process of law, will lie." *Id.* at 1362. Bailey takes the statement out of context and misapplies that language to the facts of the present case.[5] As Judge Kennedy pointed out in her concurrence, Mertik had a protectable liberty interest, *i.e.,* the privilege to teach students at the rink, that does not exist in this case. It was the withdrawal of that privilege that deprived Mertik of "a right previously held under state law ... and altered her status as a matter of state law." 983 F.2d at 1368. (Citation omitted.) Judge Kennedy concluded that "it was that alteration of a legal status which, combined with the injury resulting from defamation, justified the invocation of procedural-safeguards." *Id.*

No such alteration in legal status occurred in the present case. The U.S. Court of Appeals for the Sixth Circuit recently held in *Ferencz v. Hairston,* 119 F.3d 1244 (C.A.6 1997), that government action prohibiting a contractor from bidding on and receiving government contracts does not alter or extinguish any "right or status previously recognized by state law." *Id.* At best, all Bailey had was a "right" to carry out the contract, but if this "right" was denied to it by the

---

**5.** *Mertik* discussed the United States Supreme Court decision in *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), which held that "a stigma to reputation that affects only future employment opportunities does not give rise to a protected liberty interest." To the extent that the City's words or deeds can be said to have "stigmatized" Bailey in the eyes of potential clients or among its peers in the industry, the stigma only affected opportunities that occurred

after the declaration of default, *i.e.,* in the future. Bailey notes that the City's declaration of default itself affected Bailey's opportunities as the contractor under PC–665, but any stigma that arose from the declaration could not have, as a matter of logic, affected those existing opportunities under PC–665. The stigma, if it occurred, was a result of the declaration of default; not a cause of it.

City, all it has under state law is an action for breach of contract.

■ Even though Bailey has no protectable property or liberty interest, this is not the sole basis upon which Bailey's due process claims fail. Bailey's claims also fail because it cannot demonstrate that the City provided it with inadequate process. Supreme Court cases teach that

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interests that will be affected by official action; *second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;* and, finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See, e.g., Goldberg v. Kelly, supra,* at 263–271, 90 S.Ct. at 1017–1022.

*Mathews v. Eldridge,* 424 U.S. 319, 334–335, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). (Emphasis added.)

As the second *Mathews* factor points out, it is clear that the hearing Bailey claims was owed to it would have served no "probable value." At the time the City sent its February 21, 1996 letter informing Bailey of the hearing that was to take place on February 26, 1996, the parties had already spent well over a year formulating and "ventilating" their positions to each other and to the Board of Water Commissioners.

On June 23, 1995, almost eight months prior to the City's February 21, 1996 "notice letter," Bailey, in fact, sent each member of the Board of Water Commissioners an extensive letter with an attached binder of exhibits that set forth Bailey's position regarding the "open issues relating to" Contract PC–665 and requested that the Commissioners consider Bailey's position before moving any closer to a declaration of default. After the letter, both sides spent additional time trying to resolve issues through negotiations that, for a time, produced a potential settlement. Finally, Bailey stated its position with even

greater clarity when, on February 9, 1996, after marshalling its claims in accordance with Fed.R.Civ.P. 11, it filed a forty-nine page complaint.

DeRiemaker's February 21, 1996 letter giving Bailey notice of a hearing could not have come as a surprise to Bailey. Both Santo, Bailey's in-house counsel, and Rosica, Bailey's Chief Operating Officer, acknowledged that they received a letter from the City dated May 25, 1995 in which the City warned Bailey of the possibility of default. In response to that letter, Bailey spent close to nine months preparing for the possibility of litigation. Santo, in fact, admitted that his outside counsel began preparing draft complaints up to four months prior to DeRiemaker's February 21, 1996 letter. Even though DeRiemaker's February 21, 1996 letter provided arguably only short notice of the February 26, 1996 hearing, Bailey still could have attended and adequately set forth its "well-ventilated" position or it could have asked for additional time. That is all that due process requires; it is not exhaustive or meticulous process. A contrary conclusion would violate the clear policy stated by the third *Mathews* factor which permits courts to weigh the fiscal and administrative burdens imposed by additional process when determining if a party received due process.

The U.S. Court of Appeals for the Fifth Circuit implicitly recognized this principle in *Boucvalt v. Board of Comm'rs of Hosp. Service Dist.,* 798 F.2d 722 (CA 5 1986). That case involved a dispute over the interpretation of a personal services contract. The defendant hospital wanted plaintiff to report directly to the hospital's executive director. Defendant also attempted to show that plaintiff had engaged in misconduct. After defendant terminated plaintiff, plaintiff filed suit claiming a deprivation of due process because he did not receive an adequate pre-termination hearing. The court rejected that claim, noting that plaintiff had already stated his position before the hospital's board. The court reasoned that due process does not require the holding of a "full evidentiary hearing" prior to a deprivation of property where the issues in dispute were "well-venti-

lated" and the only open questions were ones of interpretation. *Id.* at 730–731.

Bailey has attempted to finesse the logic of *Boucvalt* by arguing that the present case is distinguishable on grounds that the City had either prejudged the case or appeared to have prejudged it. Bailey points to letters written by Gorden and DeRiemaker in the summer of 1995 and to the letter of DeRiemaker of January 31, 1996 as evidence of such prejudgment. A review of each of these letters reveals no such prejudgment. To the contrary, they either indicated a willingness to resolve the parties' differences or set forth the position of the City as Article 3 of PC–665 required.

On July 10, 1995, Director Gorden responded to Bailey's submission of June 23, 1995 and advised Bailey that, because it had not complied with the claims procedures required by PC–665, that claims first be submitted to the General Superintendent of Engineering (DeRiemaker), that it was "doubtful" that the Board of Commissioners would take "meaningful" action *at that time*. Assuming that Gorden could speak for the Board, a questionable proposition advanced by Bailey, the letter did not say that the Board would not take meaningful action at some other time. Gorden suggested that "a meeting be arranged between Bailey and DWSD executives to discuss the situation and explore alternative courses of action." These are hardly the words of finality.

Similarly, Gorden's letter of July 21, 1995, while expressing his opinion that the Board of Water Commissioners would view Bailey's June 23, 1995 letter with a degree of cynicism, invited further discussions. The letter reads:

> A thorough review of your [June 23rd] letter to the Commissioners is underway. However, I doubt our technical response will bring us closer to a solution. The Contract Documents are clear. It is the difference in interpretations that are recondite. This means we, singularly and then together, must assess whether or not

we wish to continue, as it will require sacrifice (loss) by both parties. If this is not an acceptable option and your and our drivers may not allow the amounts necessary, then it is incumbent on us to agree to disagree and proceed. However, if you and/or Mr. Canatello wish to visit Detroit within the next 10 days and discuss substantial alternatives (*i.e.*, TWTS, design/build disposition of claims), I would gladly clear my calendar for such a meeting and make the appropriate people available. As I have stated before, my fear is that the both organizations have developed intractable positions and that the necessary and meaningful compromises needed will be extremely hard, if not impossible, to accomplish.

> Call me at your earliest convenience to discuss alternatives and set a time and date for a meeting.

DeRiemaker's letters similarly do not indicate a predisposition to default. DeRiemaker's response to Bailey's June 23rd letter, while setting forth the City's position on the "open issues" related to PC–665, did not foreclose the possibility that the parties might reach a meeting of the minds. Indeed, the parties worked for approximately three months following the sending of that letter to reach a settlement.[6]

DeRiemaker's January 31, 1996 letter was mandated by Section 3.4.2 of the contract, which as explained above, required that Bailey be notified of the City's intention to declare default and the reasons behind it. Bailey agreed to that provision and cannot now complain because the City complied with it.

■ Bailey's approach fails to recognize that a free exchange of differing contractual interpretations and the open expression of positions is indispensable to informal resolution of contract disputes. Bailey expects too much when it demands that DWSD staff members remain completely neutral in disputes to which DWSD is a party. As a party to a contract, it was inevitable that the members of the DWSD staff would stake out

---

**6.** The negotiation and execution of the parties' October 1995 Memorandum of Understanding (MOU) also draws into question the existence of a predetermination. If the City had already made up its mind in the spring or summer of 1995 to declare a default, there would have been no good reason for it to engage in the negotiation that brought about the MOU.

positions relative to the performance of those with whom DWSD contracts. Indeed, DeRiemaker and Gorden might have been derelict in their duty had they not strongly advocated the position that DWSD felt it had to take. Bailey implicitly recognized this duty when it agreed to Section 3.4.2 which required the Project Engineer [DeRiemaker] to take a position with regard to Bailey's performance and express it prior to any entry of default.[7]

■ Putting aside for a moment the City's contractual obligation to set forth its position prior to default, Bailey argues that it had the right to set forth its position; but Bailey also took the position that "procedures under a terminated contract have no meaning."[8] Having freely announced that position after consulting with counsel, it follows that Bailey's decision to file the present lawsuit clearly indicated Bailey's intent to abandon the dispute resolution provisions of PC–665 which provided for the hearing that Bailey claims was constitutionally required.

Bailey made its waiver even clearer on February 26, 1996 when, after being notified that the City intended to hold a default hearing on February 28, 1996, Santo issued Bailey's stark refusal to attend, not just the hearing scheduled on February 28, 1996, but any hearing before the "same parties" that supposedly "denied all the relief which [Bailey] ... requested":

> We will not attend your hearing, because DWSD has breached and terminated Contract PC–665, and procedures under a terminated contract have no meaning.
>
> We refer you to the Complaint in the civil action captioned Elsag Bailey, d/b/a Bailey Controls Co. v. City of Detroit, et al, Civil Action No. 96–70623(AC) ... for an explanation as to how and why DWSD breached, abandoned, and terminated Contract PC–665....
>
> Indeed, among our grievances is that DWSD administered Contract PC–665 in such an arbitrary manner as to nullify the procedures which Contract PC–665 was supposed to create. For that reason, we could not realistically subject ourselves to a hearing by the same parties who have consistently denied all the relief which we have requested.

Faced with such a rigid position, it would have been pointless for the City to reschedule the hearing set for February 28, 1996; nothing in Santo's letter stated that Bailey would attend. Indeed, it seems to me that in February 1996 Bailey was not interested in focusing attention on default proceedings, but rather on the lawsuit it had started. Bailey only became concerned about the default hearing after it had had some months

7. Similarly meritless is Bailey's argument under *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), and its progeny that it was denied due process because the City had a pecuniary interest in the outcome of the case. Gibson involved an adverse decision against a group of licensed optometrists made by a state administrative board that contained competing optometrists who stood to gain financially from the adverse ruling they rendered. The U.S. Supreme Court ruled that the board members' pecuniary interests rendered them unqualified to provide due process.

While it is true in the present case that the City had an obvious financial stake in the decision to declare a default of contract PC–665, there is a rather obvious distinction between the *Gibson* line of cases and the one at bar: whereas Bailey freely agreed during the arm's length negotiation of PC–665 to put the City in the position of arbiter, the parties in the *Gibson* cases did not have the right to choose who would decide their disputes. Because Bailey did have such a right, it cannot now be heard to complain that the arbiter it helped select had a conflict of interest. That "conflict" was never a secret and, if Bailey had an objection, the time to raise it was when PC–665 was negotiated.

Further, if Bailey is correct that the sort of pecuniary interest presently at stake renders the City constitutionally unqualified to give process, then no amount of care exercised by the City in providing Bailey process would be satisfactory. Whatever the City did, its pecuniary interest would still exist and, if I accepted Bailey's argument under *Gibson,* Bailey would still be able to complain about what had otherwise been flawless process. Such a result would be in hopeless conflict with common sense. It would allow Bailey in one breath to demand that the allegedly biased Board of Water Commissioners act as arbiter and, in another, to complain about the bias once the arbiter complies with the demand to act.

8. *See* Letter of Mark Santo, dated February 26, 1996, exhibit 19 to Bailey's Memorandum re: Constitutional Issues, dated July 9, 1997.

within which it could rethink its litigation strategy.[9]

Bailey denies this lack of interest and argues that it had always wanted an impartial default hearing, citing as proof the letters it sent to each member of the Water Board in June of 1995. Even if Bailey is correct that its actions leading up to the events of February 1996 asserted its "right" to a hearing, it is clear that this position had changed after Bailey filed its complaint.

The situation is akin to that faced by the United States Supreme Court in *D.H. Overmyer v. Frick*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), where the majority ruled that a party to a civil suit could waive its due process rights if its waiver was voluntary, knowing, and intelligent. As *O'Neill v. City of Philadelphia*, 817 F.Supp. 558 (E.D.Pa. 1993), pointed out, the Supreme Court has "never defined precisely what constitutes a voluntary, knowing, and intelligent waiver." *Id.* at 568. The Supreme Court has, however, "stated that whether a person has waived a constitutional right 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience and conduct' of the waiving party . . ." *Id.*

The circumstances surrounding Bailey's background, experience and conduct lead me to conclude that Bailey waived any "right" it may have had to a pre-termination default hearing. Like the plaintiff in *Overmyer*, Bailey was a well-counselled and sophisticated corporate entity. If it had any intention of reserving its right to be heard, it certainly could have been more direct. At the very least, it could have attempted to obtain an adjournment. Instead, Bailey consciously embarked on a course that led it into this court, making pointless any attempts to re-

solve its problems through the contractual dispute resolution procedure.

**B.** *Alleged Illegal Entry and Seizure of Property*

Bailey also contends under 42 U.S.C. Section 1983 that the City violated Bailey's Fourth Amendment[10] right to be free from illegal searches and seizures. It points to the incidents occurring at DWSD's Huber Facility and at a construction trailer housing Bailey offices at the DWSD's Waste Water Treatment Plant (WWTP). It says that some of these incidents occurred prior to the City's declaration of default with the help of the City Police Department. The City asserts that Bailey's attorney gave it permission to act as it did, or alternatively that PC–665 gave it the authority to act as it did, and that, assuming that it acted improperly in executing a seizure, that its liability was a breach of PC–665, not a constitutional deprivation.

I agree. As an initial matter, I note the holding of the United States Supreme Court that "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (Citing *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960)).

■ I do not find that the City acted unreasonably. Bailey's attorney demanded on March 27, 1996 that the City "safeguard" equipment left on the worksite "from damage or theft." Bailey cannot now complain that the City acted unreasonably when it took steps that were apparently designed to do that.

■ Even without the March 27, 1996 letter, the City acted reasonably when it en-

---

**9.** Bailey misses the point when it argues that it could not have asserted its due process claims earlier because they did not accrue until after its original complaint had been filed. The issue, however, is not one regarding the timing of Bailey's pleadings. Rather the issue is Bailey's conduct and whether it was inconsistent with the assertion of its rights. As set forth above, I hold that it was not.

**10.** The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. CONST. Amend. IV.

tered Bailey's offices on DWSD premises after Bailey clearly signified its intent to cease work on the project.[11] The cessation of work constituted an abandonment of the property. Because Bailey has no legitimate expectation of privacy in abandoned property, there was no Fourth Amendment prohibition against the City's conduct at either the Huber offices or WWTP trailer. *United States v. Wider*, 951 F.2d 1283 (C.A.D.C. 1991), *See also Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (HARLAN concurring).[12] I find no violation of Bailey's Fourth Amendment rights and, thus, no claim under 42 U.S.C. Section 1983.

In any event, if Bailey suffered damages because of the City's entries, they can be addressed in the damages portion of the upcoming breach of contract trial as consequential damages.

Accordingly, I dismiss with prejudice Counts I and II of Bailey's Amended Complaint.

IT IS SO ORDERED.

---

11. *See* Letter dated February 9, 1996 from G.A. Rosica (of Bailey Controls Co.) to DeRiemaker: "Bailey Controls was left with no alternative but to cease performance of the work and pursue its legal remedies."

12. As a purely practical matter, because Bailey had said it was not going to continue with the project, the City was certainly entitled to clear from its property anything that Bailey did not remove. The Constitution does not require the City to store property until the final disposition of this case.