**Dale D. HOOVER, Plaintiff,**

v.

**Patricia RADABAUGH,
et al., Defendants.**

**No. 99CV339.**

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 27, 2000.

Emily Jane Lewis, Farlow & Lewis LLC, Dublin, OH, for plaintiff.

Bridgette Caryn Roman, Stephen Jesse Smith, Schottenstein Zox & Dunn, Columbus, OH, for defendants.

### OPINION AND ORDER

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on the Defendants' Motion for Summary Judgment filed on August 22, 2000.[1] The Plaintiff, Dale Hoover, brought four claims against the Defendants: (1) violation of his right to free speech under the First Amendment, (2) violation of his right to due process under the Fourteenth Amendment, (3) violation of Ohio's public policy tort, and (4) conspiracy, following his termination from employment with the City of Circleville on June 15, 1998. For the following reasons, the Defendants' Motion is **DENIED**.

## II. FACTS

As this is before the Court on the Defendants' Motion for Summary Judgment, the Court will present the facts in the light most favorable to the non-movant, Mr. Hoover.

Mr. Hoover began working for the City of Circleville as a contract employee on August 19, 1994, performing electrical inspections. In January of 1996, he became a full-time employee of the Circleville Building Department. Mr. Hoover has a Master's degree in industrial technology and was certified as a Class III building and electrical inspector. In August of 1997, Allyn Sheldon was hired as the Department's Chief Building Officer ("CBO"). Mr. Sheldon was Mr. Hoover's direct supervisor.

Mr. Sheldon and Mr. Hoover's first dispute involved the implementation of a form checklist for inspectors. Mr. Hoover told Mr. Sheldon that the form had some errors in code compliance, including errors in grounding, bonding and in setting the pressure when testing the plumbing. Mr. Sheldon did not acknowledge the errors and did not correct the form.

On three major projects, Mr. Sheldon ordered Mr. Hoover to sign off on building inspections that did not meet code, or that he was not certified to perform: the Clifton Building, Castle Inn and Boggs Hair Salon projects. The Clifton Building dispute involved a plumbing inspection that Mr. Sheldon told Mr. Hoover to conduct without the proper plumbing certification. Mr. Hoover protested this assignment, but Mr. Sheldon demanded that he go to the site. Mr. Hoover went to the site and informed the owner, Scott Clifton, that he could give him an opinion, but that he was not a plumbing inspector. Mr. Hoover and contract plumbing inspector, Chris Patowski, later returned to the site. Mr. Patowski advised Mr. Clifton that the plumbing was not vented properly and that it needed to be repaired.

The following morning, Mr. Clifton and his tenant, Bob Huffer, a lawyer and a

---

1. The Defendants in this action are the City of Circleville, Mayor Patricia Radabaugh, Safety Director, Jean Droste and Director of Human Resources, Ralph Starkey.

county commissioner, went to see Mr. Sheldon and threatened to sue the Building Department for delaying the project. Mr. Sheldon permitted Mr. Clifton, who is characterized by Mr. Hoover as a wealthy and influential man in Circleville, to "cover-up" the defective plumbing. When it was time for the final inspection, Mr. Sheldon incorrectly told Mr. Patowski that Mr. Hoover had looked at the plumbing. The Mayor, Mr. Starkey, Director of Human Resources, and Ms. Droste, Safety Director,[2] all told Mr. Hoover to sign off on the violations and to override Mr. Patowski's violations. Mr. Hoover refused. Mr. Hoover contacted Garry Krebbs, the State's chief plumbing inspector, and asked him to intervene in the situation. When Mr. Sheldon heard that Mr. Krebbs was coming, he canceled the scheduled inspection.

Mr. Hoover later ran into Mr. Clifton at Pay & Save. Mr. Hoover told Mr. Clifton that Mr. Sheldon had permitted the defective plumbing to be covered up, and Mr. Hoover's statement got back to Mayor Radabaugh. This became the subject of the "bad mouthing" that resulted in a written warning from Ms. Droste.

When Mr. Patowski did the plumbing inspection of Castle Inn, he found problems such as non-insulated plumbing in the attic. Mr. Sheldon contacted Mr. Patowski to determine whether he would compromise his inspection by not referencing some of the code violations. In addition, Castle Inn was built without an architect-stamped-and-sealed drawing as required by Ohio's building code. Mr. Sheldon was responsible for ensuring compliance of this aspect of the project.

Boggs Hair Salon was also built without a building permit or drawing. Mr. Hoover noted no ceilings or insulation in part of the building creating a firewall hazard, no exit lights, no handicap accessibility, and a hot water tank with an open flame. In addition, the plumbing had the wrong size vents, and the water back flow devices were not installed. Mr. Hoover advised Mayor Radabaugh, Ms. Droste and Mr. Starkey of the situation and was told to sign off on the list of violations. Mr. Hoover instead informed Mr. Boggs that he had ninety days to correct the violations. Without a final plumbing inspection and without Mr. Boggs correcting the code and safety violations that Mr. Hoover had noted, Mr. Sheldon issued a certificate of occupancy permitting Mr. Boggs to open the hair salon.

Mr. Hoover decided, due to the problems he perceived with Mr. Sheldon and the Building Department, to go before the Building Department's Advisory Board ("Advisory Board"). The Advisory Board is comprised of contractors and realtors from the area. Mr. Hoover attended the Advisory Board's meetings to inform them of his concerns about the Department condoning and approving non-compliance with building codes. Mr. Hoover also alerted the State Board of Building Standards to the issues.

In addition to the meetings with the Advisory Board, Hoover had several meetings with City officials Sheldon, Droste and Starkey regarding the activities taking place in and around the Building Department. The first meeting between Mr. Sheldon, Mr. Hoover, Ms. Droste and Mr. Starkey occurred on December 22, 1997. Mr. Starkey warned Mr. Hoover during the December 22 meeting not to criticize the Building Department or Mr. Sheldon in public. Mayor Radabaugh, Ms. Droste and Mr. Starkey agreed that it was inappropriate for an employee to "spill the bad news all over the community." Mr. Hoover discussed Mr. Sheldon's non-compliance with building codes, and Mr. Sheldon's instructions that he sign off on inspections with code violations. A December 29, 1997

2. Mayor Radabaugh appointed Jean Droste to the position of Safety Director for the City of Circleville. The Safety Director supervises the Police Department, Fire Department, Emergency Medical Squad and the Building Department.

memo outlining the substance of the meeting stated: "Jean [Droste] and Ralph [Starkey] stressed the importance of not downgrading the Building Department or its employees in public."

On January 7, 1998, there was a second meeting scheduled by Mr. Sheldon to "straighten things out" between himself and Mr. Hoover. Mr. Sheldon wrote a letter to Ms. Droste outlining the issues with Mr. Hoover, wrote up a list of concerns he had about Mr. Hoover's performance and included a written warning. The infractions spanned the entire length of the employment relationship and were not discussed with Mr. Hoover prior to the letter.

On February 27, 1998, a meeting was held between Messrs. Hoover and Sheldon and Mayor Radabaugh. Mr. Sheldon accused Mr. Hoover of failing to perform a plumbing inspection at Boggs Hair Salon. Mr. Hoover stated that he refused to sign off on the plumbing inspection because there were code violations. Mr. Starkey told Mr. Hoover to look for another job. The Mayor said that someone had to go, and it was going to be Mr. Hoover.

On March 27, 1998, Mr. Hoover went to a city-wide supervisor's meeting. Mr. Hoover thought the meeting was a public one; Mr. Starkey and Ms. Droste, however, told him to leave because the meeting was intended only for designated supervisors. Mr. Hoover left, and was later informed that his conduct constituted insubordination.

Ms. Droste and Mr. Hoover had a meeting in March or April of 1998. Ms. Droste discussed the fact that Mr. Hoover was questioning Mr. Sheldon's practices. Mr. Hoover told Ms. Droste that Mr. Sheldon was threatening to fire him.

On March 30, 1998, Mr. Sheldon gave Mr. Hoover a memo listing three acts of insubordination, including: (1) failure to complete a plumbing inspection at Boggs,

(2) indication that Mr. Hoover desired to attend the supervisors meeting after being informed that he was not invited, and (3) being told by the Law Director that Mr. Sheldon was Mr. Hoover's direct supervisor, yet desiring to attend the supervisor's meeting.[3] On March 31, 1998, Mr. Hoover met with Mr. Starkey and Ms. Droste to discuss his annual evaluation. Mr. Hoover told Mr. Starkey and Ms. Droste that he wished to appeal his evaluation. Mr. Hoover was concerned that the complaints he had against Mr. Sheldon were not being placed in Mr. Sheldon's personnel file.

On June 11, 1998, Mr. Sheldon and Mr. Hoover had an altercation in the break room. Mr. Hoover's version of the events is quite different from Mr. Sheldon's. According to Mr. Hoover, he, Mr. Sheldon and Ms. Smalley were in the break room in the early morning when Mr. Hoover was copying documents. Mr. Hoover told Mr. Sheldon that he was going to get an attorney. Mr. Sheldon responded that Mr. Hoover should leave his name out of the lawsuit. Mr. Hoover replied, "you're the number one reason why this is happening, so your name is going to be in it." Mr. Hoover stated that he intended to send the records he was copying to the State. Mr. Sheldon and Ms. Smalley then left the room, and Mr. Hoover continued copying files.

About five minutes later, Mr. Sheldon returned to the break room. Mr. Hoover described Mr. Sheldon as a "madman" and thought that he was going to destroy the documents. Mr. Sheldon forcefully came toward Mr. Hoover. Mr. Hoover, feeling threatened, put out his hands as Mr. Sheldon pushed his full weight into him. Mr. Sheldon stated, something to the effect of, "I've got a good thing going here, I am not going to let you mess my job up." When Mr. Sheldon came at Mr. Hoover again, Mr. Hoover pushed Mr. Sheldon out of the room to avoid a possible fight, and said: "If you come back in here, I'll kill you."

---

**3.** After the meeting, Ms. Droste removed items (1) and (3) discussed in the memo, because she believed that they already had been discussed with Mr. Hoover.

About fifteen minutes after leaving for inspections, Mr. Hoover was called back into the Building Department, placed on administrative leave and was told to return his pager and other items that belonged to the City.

Ms. Smalley testified that she, Messrs. Sheldon and Hoover were in the break room, and that she noticed Mr. Hoover at the copy machine. Mr. Sheldon went up to Mr. Hoover and a "pushing match" began with Mr. Sheldon trying to grab the documents. Mr. Sheldon used his hips and body to move Mr. Hoover away from the copier. Ms. Smalley left the room and returned to her office next door. Ms. Smalley saw Mr. Sheldon leave the break room in a normal manner and did not see him "shoved" out the door.

On June 11, 1998, Mayor Radabaugh, Mr. Starkey and Ms. Droste made the decision to discharge Mr. Hoover. Ms. Droste and Mrs. Starkey handed Mr. Hoover a "Notice of Predisciplinary Meeting" citing the infraction as an assault and a threat to Mr. Sheldon. The meeting was scheduled for the following day, June 12, 1998. Mr. Hoover asked if he could respond to the Notice, but Ms. Droste and Mr. Starkey did not allow him to do so. Mr. Hoover protested that the meeting scheduled for the following day was too soon to permit him to find counsel, and in response, Mr. Starkey handed him a form to sign entitled "Waiver of Predisciplinary Meeting." The form stated: "In response to notification of charges against me on June 11, 1998, I hereby waive my right to a pre-disciplinary meeting." Mr. Hoover believed that by signing the form the pre-disciplinary meeting would be rescheduled for another day. Mr. Hoover called Mr. Starkey at home that night and told him that he could not find a lawyer. Mr. Hoover thought that after the phone call, Mr. Starkey would postpone the hearing.

The June 12, 1998 letter, which was provided to Mr. Hoover, cited four reasons for terminating him:

1. *Work Rule No. 6:* Refusal to carry out work assignments.
2. *Work Rule No. 17:* Using insulting, malicious and/or threatening and/or intimidating language to your supervisor.
3. *Work Rule No. 21:* Striking or physically assaulting your supervisor.[4]
4. *Work Rule No. 29:* Engaging in personal work or business while on duty using City equipment for personal needs.

The termination letter did not advise Mr. Hoover of his right to appeal the termination.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could

---

**4.** With respect to the alleged violation of work rule no. 21, physical assault, Ms. Smalley was a witness to the incident, but was not ques-

tioned. In her deposition, Ms. Smalley stated that she did not see Mr. Hoover initiate physical contact.

return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The existence of a mere scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

## IV. ANALYSIS

### A. Free Speech

■ The Plaintiff, Mr. Hoover, has brought a First Amendment retaliation claim in connection with his termination on June 12, 1998. There are three elements necessary to establish a claim of retaliation under the First Amendment:

(1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir.1998).

■ Under the first prong, the plaintiff must make a threshold showing that the speech addressed a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

Whether speech addresses a matter of public concern is a question of law to be "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. In this Circuit, "[a] matter of public concern usually involves a matter of political, social, or other concern to the community." *Jackson·v. City of Columbus,* 194 F.3d 737, 746 (6th Cir.1999). For example, the "workings" of a fire department and "public safety" have been found to be matters of public concern, *Mattox v. City of Forest Park,* 183 F.3d 515, 521 (6th Cir.1999), as has the exposing of "graft and corruption in government." *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir.1986). Courts typically do not review personnel decisions when the employee's speech touches upon "matters only of personal interest." *Jackson v. Leighton,* 168 F.3d 903, 909 (6th Cir.1999). In *Thomson v. Scheid,* 977 F.2d 1017 (6th Cir.1992), the court held that the protections of the first amendment "[do] not extend to speech made in the course of acting as a public employee." *Id.* at 1020; *see also Connick,* 461 U.S. at 147, 103 S.Ct. 1684.

■ If the speech is found to be a matter of public concern, the speech must be balanced against, and outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Sixth Circuit has articulated that "[i]n striking the balance, courts should consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine the legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by supervisors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Commonwealth of Ky.,* 24 F.3d 1526, 1536 (6th Cir.1994).

As for the second element, whether Defendant's adverse action caused Plaintiff to

suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity, the Court looks first to the type of adverse action involved. Adverse actions have been held to include, for example: discharge, dismissal, suspension, failure to promote, nonrenewal of a contract and transfer. *Mattox,* 183 F.3d at 521; *Thaddeus–X v. Blatter,* 175 F.3d 378, 396 (6th Cir.1999). Under this standard, Plaintiff undeniably suffered an adverse action.

The third element is a showing of a causal connection between the speech and the adverse action, where "the subjective motivation of the defendants is at issue." *Thaddeus–X,* 175 F.3d at 399. When the defendant's "intent is at issue," "summary judgment is particularly inappropriate." *Marohnic,* 800 F.2d at 617. The Sixth Circuit has adopted the finding that " 'an act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.' " *Bloch,* 156 F.3d at 681–82 (quoting *Matzker v. Herr,* 748 F.2d 1142, 1150 (7th Cir.1984)). And, as there is rarely direct evidence of the defendant's intent, "summary disposition" is unlikely. *Bloch,* 156 F.3d at 682; *see also Perry v. McGinnis,* 209 F.3d 597, 604 n. 4 (6th Cir.2000) (finding that the third prong is a question of fact).

■ Once the plaintiff establishes the necessary three elements, the burden shifts to the defendant to demonstrate "that it would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton,* 168 F.3d at 909; *see also Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Thaddeus–X,* 175 F.3d at 399. If the defendant can meet this burden, it is entitled to summary judgment. *Thaddeus–X,* 175 F.3d at 378.

The Defendants contend that the Plaintiff's right to free speech was not implicated, as he was terminated as a result of his death threat and the altercation with Mr. Sheldon that took place on June 11, 1998. The Plaintiff argues that his speech on the issues of the City of Circleville and its CBO's non-compliance with building codes, and the accompanying health and safety hazards, are matters of public concern, and are protected by the First Amendment.[5]

■ First, this Court finds that the Plaintiff engaged in constitutionally protected activity. The matters Mr. Hoover spoke about were "matter[s] of concern to the community" as they involved the safety of public buildings. The speech did not occur outside of Mr. Hoover's capacity as a public employee: for example, he spoke to the Advisory Board, contacted Mr. Krebbs, the State's chief plumbing inspector and had discussions with Mr. Clifton at the Pay & Save. In fact, it was the discussion with Mr. Clifton that resulted in Mr. Hoover initially being disciplined.

In balancing the interests, although the City may have an interest in a collegial work force, this does not outweigh Mr. Hoover's First Amendment right to speak on the topics upon which he was speaking—the safety of commercial buildings, their inhabitants and/or contents, and the City's lack of compliance with State regulations.

As for the second prong of the test, as a matter of law, the case law is clear that

---

5. The Plaintiff argues that his discharge was motivated by his speech because:

(1) Mr. Hoover was told not to discuss Building Department issues in public; (2) Mr. Sheldon threatened to fire him for insubordination because of his refusal to engage in illegal activity; (3) the City failed to investigate Mr. Hoover's concerns about noncompliance with building codes and demanded that Mr. Hoo-

ver sign off on inspections with code violations; (4) Mr. Starkey and Mayor Radabaugh advised Mr. Hoover to look for another job; (5) Mr. Sheldon wrote up Mr. Hoover for incidents that were meritless and that had not been investigated, and (6) Mr. Hoover was placed on administrative leave without being allowed to tell his side of the events and was not informed of his right to appeal.

termination would chill Mr. Hoover's speech. *Mattox*, 183 F.3d at 521, *Thaddeus–X*, 175 F.3d at 396.

■ Under the third prong, the motivation behind the Defendants' termination of Mr. Hoover, the Defendants argue that Mr. Hoover was terminated for three reasons. First, Defendants allege that Hoover was terminated for his physical altercation with Mr. Sheldon and his death threat to Mr. Sheldon. This evidence contradicts Mr. Hoover's statement that he merely put out his hands to stop Mr. Sheldon from coming toward him, but did not physically assault him. Hoover also denies issuing a death threat. In addition, Ms. Smalley's testimony was that she did not see Mr. Hoover initiate physical contact. At the very least, there is a genuine issue of material fact as to whether the termination was motivated by Hoover's exercise of speech rights.

Second, in the Defendants' termination letter states that Hoover's refusal to carry out work assignments led to his dismissal. This reason could be found by the factfinder to implicate protected conduct. Mr. Hoover testified that he refused to carry out these assignments because the projects had code violations and/or because he was not certified to perform them.

The third reason given by the Defendants in the termination letter—engaging in personal business—was Mr. Hoover's copying of allegedly incriminating documents, which could itself be an act of speech. *See, e.g., Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (finding that conduct may be protected by the First Amendment if there was "an intent to convey a particularized message ... and ... the likelihood was great that the message would be understood by those who viewed it.") (quotation omitted). Mr. Hoover's conduct of copying allegedly incriminating documents could be protected speech, as Mr. Sheldon clearly understood the message he was trying to convey when he told Mr. Hoover to leave his name out of the lawsuit, and also threatened him with the statement: "I've got a good thing going here, I am not going to let you mess my job up." Mr. Hoover also participated in pure speech when he told Mr. Sheldon that he was going to send the documents to the State. Based on the case before the Court, this prong ultimately is a question of fact best left for the jury to decide: whether Mr. Hoover's termination was motivated in part as a response to the exercise of his constitutional rights.

Assuming that Mr. Hoover established these three elements, the burden shifts to the Defendants to show that they would have terminated Mr. Hoover in the absence of his protected speech. The Defendants contend that they would have terminated Mr. Hoover solely for the altercation in the break room. This Court finds, however, that this argument is suspect. First, Mr. Hoover had been warned against speaking publicly about the Building Department's inspections before the altercation. Second, the Defendants did not interview the only witness to the altercation, Ms. Smalley. Third, Mr. Sheldon was not disciplined for the shoving and shouting match, while Mr. Hoover was terminated. Fourth, the altercation occurred when Mr. Hoover was arguably in the act of exercising his First Amendment rights, copying documents that he told Mr. Sheldon he intended to send to the State. Mr. Sheldon was aware of Hoover's intent, which is clear from his statement to Mr. Hoover: "I've got a good thing going on here, I am not going to let you mess my job up." The fight, viewing the facts in a light most favorable to Mr. Hoover, could have been started by Mr. Sheldon in attempt to prohibit Mr. Hoover from sending the documents to the State, effectively prohibiting him from exercising his free speech rights. Finally, Mr. Hoover's job was threatened at least one time by each of the Defendants before the altercation occurred.

The Court concludes, therefore, that the Defendants are not entitled to summary judgment as they have not shown that

they "would have taken the same action in the absence of the protected activity, . . ." *Thaddeus–X,* 175 F.3d at 399. The Defendants' Motion for Summary Judgment is therefore **DENIED** with respect to Plaintiff's First Amendment retaliation claim.

### B. Due Process

 If an individual maintains a property right his continued employment, then he has the right to the procedural protections afforded by the due process clause of the Fourteenth Amendment. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Curby v. Archon,* 216 F.3d 549, 553 (6th Cir.2000). Property interests in employment are derived from independent sources "such as state law." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701; *see also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

 As a classified civil servant, Mr. Hoover held a property interest in his continued employment. *Christophel v. Kukulinsky,* 61 F.3d 479, 482 (6th Cir. 1995). Classified civil servants may be terminated only for cause and are employed during "good behavior and efficient service." OHIO REV.CODE § 124.34; *Christophel,* 61 F.3d at 482. In the case of removal of a classified civil servant, section 124.34 of the Ohio Revised Code provides: "[T]he appointing authority shall serve the employee with a copy of the order of . . . removal, which order shall state the reasons therefor. Such order shall be filed with the director of administrative services and state personnel board of review, or the commission, as may be appropriate." OHIO REV.CODE § 124.34(B).

The employee is also provided with the right to appeal: "[W]ithin ten days following the filing of a removal order, the employee, . . . may file an appeal in writing with the state personnel board of review or the commission. For purposes of this section, the date on which an order is served is the date of hand delivery of the order or the date of delivery of the order . . . ." OHIO REV.CODE § 124.34(B).[6] The Ohio Administrative Code elaborates:

> The employee shall be notified in writing, on a form provided by the director or the state personnel board of review, or equivalent form, of the statutory reasons for the action, and the effective date thereof. This form shall advise the employee of his or her right to appeal. Any such appeal shall be made in accordance with the rules of the state personnel board of review.

OHIO ADMIN.CODE § 123:1–31–01.

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.' . . . The answer to that question is not to be found in [an] Ohio statute." *Loudermill,* 470 U.S. at 542, 105 S.Ct. 1487. In *Loudermill,* the Court examined the process due two employees who held property interests in their respective employment. The Court found that the employees should have been afforded a hearing before being terminated. *Id.* at 542, 105 S.Ct. 1487. The *Loudermill* court found that the hearing does not have to be formal, but only has to provide the terminated employee "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S.Ct. 1487.

---

6. The Code continues:

If such an appeal is filed, the board or commission shall forthwith notify the appointing authority and shall hear, or appoint a trial board to hear, such appeal within thirty days from and after its filing with the board or commission, and it may affirm, disaffirm, or modify the judgment of the appointing authority.

In cases of removal or reduction in pay for disciplinary reasons, either the appointing authority or the officer or employee may appeal from the decision of the state personnel board of review or the commission to the court of common pleas of the county in which the employee resides in accordance with the procedure provided by section 119.12 of the Revised Code.

OHIO REV.CODE § 124.34(B).

As this Court has already determined that Mr. Hoover held a property interest in his continued employment, this Court must next determine whether he was provided due process. But, before reaching this question, this Court first must decide whether Mr. Hoover waived his right to a pre-deprivation hearing, as the Supreme Court has found that the "hearing required by due process is subject to waiver. . . ." *Boddie v. Connecticut,* 401 U.S. 371, 378–79, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The Court expanded:

> [The] standard for waiver in a corporate-property-right case of this kind is the same standard applicable to waiver in a criminal proceedings, that is, that it be voluntary, knowing, and intelligently made, . . . or 'an intentional relinquishment of abandonment of a known right or privilege,' . . . and . . . as the Court has said in the civil area, 'we do not presume acquiescence in the loss of fundamental rights,'.

*D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 185–86, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972) (citations omitted). In determining whether the waiver was "voluntary, knowing and intelligently made" the focus is on the facts of the particular case, "including the background, experience and conduct of the waiving party. . . ." *Elsag Bailey, Inc. v. City of Detroit,* 975 F.Supp. 993, 1004 (E.D.Mich.1997) (citation and quotation omitted).

█ Viewing the facts in the light most favorable to Mr. Hoover, his was not a knowing, voluntary or intelligent waiver. Mr. Hoover, an individual, without the advice of counsel, signed the waiver. Although a well educated individual, Plaintiff does not qualify as having the same type of knowledge and/or understanding as a "well-counseled" and sophisticated corporate entity. Mr. Hoover believed that the waiver would move the date of the hearing,

not cancel the hearing altogether. In contrast, in *Overmyer* and *Elsag Bailey,* it was the corporations that waived their rights. In *Elsag Bailey,* the court commented that Bailey, like the plaintiff in *Overmyer,* was a "well-counseled and sophisticated corporate entity." *Elsag Bailey,* 975 F.Supp. at 1004. Indeed, central to the courts' rulings was the fact that these corporate entities had the benefit of counsel's advice in making an informed waiver. Mr. Hoover had no such opportunity. He did not have counsel present to explain to him the implications of signing a waiver.

This Court also finds compelling the fact that Mr. Hoover contacted Mr. Starkey on the night of June 12, 1998, in accordance with the instructions on the Notice. The Notice stated that if he had "any questions in regard to this procedure" that he should contact Ralph Starkey, which he did. Following the June 12 phone conversation, Mr. Hoover believed that his hearing would be rescheduled. The Court finds that Mr. Hoover's waiver was not "knowingl[ly] and intelligently made" and was not valid.

█ As Mr. Hoover did not waive his right to a predeprivation hearing, this Court next must determine whether Mr. Hoover was afforded procedural due process. The Court finds that he was not. First, Mr. Hoover was not provided with a pre-deprivation hearing as required by *Loudermill.*[7] Second, although only statutorily required, Mr. Hoover was not informed of his right to appeal.

Defendants argue that if an employer does not notify its employee of his right to appeal, that the time limit for appeal is tolled until after the employee discovers that he holds this right. *McCauley v. Noble County Sheriff,* No. 234, 1999 WL 85533, 1999 Ohio App. LEXIS 465 (Ohio App. Feb. 8, 1999). The Court finds the

---

7. Even if this Court were to find that Mr. Hoover waived the hearing, Mr. Hoover stated that he tried to explain his version of the events when first given his Notice. The Defendants denied his request. If Mr. Hoover had been allowed at that time to explain his version of the events, his due process rights may have been preserved.

Defendants' argument disingenuous. As a threshold matter, Mr. Hoover testified that he filed his right to appeal within days of learning of such right, but the Board denied Mr. Hoover's appeal as untimely. Moreover, the Administrative Code specifically states that the written notice should have informed Mr. Hoover of this right and to appeal. And finally, although *McCauley* and *Roberts v. Scott*, No. 80AP538, 1980 Ohio App. LEXIS 13532, at * 5 (Ohio Ct.App. Dec. 31, 1980), stand for the proposition that the ten-day period commences on the date Mr. Hoover learned of his right to appeal, both are unreported cases with no precedential value. These cases do not negate the fact that Mr. Hoover was not provided a pre-deprivation hearing, as mandated by *Loudermill,* which is constitutionally required, while the appeal is not.

Based on all of these factors, the Defendants' Motion for Summary Judgment on Mr. Hoover's procedural due process claim is **DENIED.**

### C. Qualified Immunity

 The Defendants next argue that they are entitled to qualified immunity. Qualified immunity extends to individuals performing discretionary functions unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Discretionary functions" are those actions which involve an exercise of judgment or are a matter of choice. *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). It is the conduct of the defendants, and not their status, that determines whether a function is discretionary. *Id.*

A two-step test has been adopted by the Sixth Circuit to determine whether an individual is entitled to qualified immunity. The first step is "whether plaintiff has shown a violation of a constitutionally protected right. . . . If the answer is yes, then the second step is to determine whether

the right is so 'clearly established' that a 'reasonable official would understand that what he is doing violates that right.' " *Sowards v. Loudon County*, 203 F.3d 426, 438 (6th Cir.2000) (citations omitted). In determining whether the right in question was "clearly established," courts should look to United States Supreme Court and Sixth Circuit decisions. *Williams v. Ellington*, 936 F.2d 881, 885 (6th Cir.1991); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (finding that a right is "clearly established" if "a reasonable official would understand that what he is doing violates that right."). In the context of a First Amendment case, the Sixth Circuit has held that qualified immunity is subject to a fact-specific inquiry rather than an abstract one. *Guercio v. Brody*, 911 F.2d 1179, 1184 (6th Cir.1990). The *Guercio* court found that the proper question is "whether Guercio's first amendment rights to free speech were so evident from pre-existing law ... when she was ordered discharged by Judge Feikens that, measured objectively, he was under an affirmative duty to refrain from such conduct." *Id.*

The thrust of the Defendants' qualified immunity argument focuses on Mr. Hoover's First Amendment claim. Defendants contend that there was no right to threaten to kill your supervisor that was clearly established at the time of the Plaintiff's act; a reasonable public official could have found that the speech was not a matter of public concern; and finally, reasonable public officials could disagree as to whether Mr. Hoover's interest in speaking outweighed the City's interest in regulating speech. The Plaintiff responds that under the first step, Mr. Hoover has presented significant evidence that Defendants fired him in violation of a constitutionally protected right. It was well established at the time that Plaintiff had a right to free speech on a matter of public concern, such as government compliance with building standards.

■ The Court concludes that the Defendants are not entitled to qualified immunity. First, as previously discussed, Mr. Hoover has sufficiently argued that both his First and Fourteenth Amendment rights were violated by the Defendants, therefore establishing the first prong of the Sixth Circuit's test. Second, the rights in question were clearly established in 1998, the date of Mr. Hoover's termination. *See, e.g., Loudermill,* 470 U.S. 532, 105 S.Ct. 1487 (1985) (Fourteenth Amendment due process); *Mount Healthy City Sch. Dist. Bd. Of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (First Amendment). Although Mr. Hoover was allegedly terminated for the death threat, as already discussed, this was not the sole reason given by the City for his termination. Reasonable officials, such as the Defendants in this case, would understand, for example, that disciplining, let alone terminating an employee for speaking publicly about a matter of public concern violated his First Amendment rights. As already set forth by this Court, the State did not meet its burden of demonstrating that it would have terminated Mr. Hoover in the absence of protected activity. Furthermore, with respect to the Fourteenth Amendment due process claim, it is undisputed that Mr. Hoover was not provided with a predeprivation hearing. Based on this, the Court **DENIES** the Defendants' Motion for Summary Judgment on the issue of qualified immunity.

### D. City's Liability under *Monell*

■ A municipality, such as the City of Circleville, may be held liable for constitutional violations based on a policy or custom of the City. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Brown v. Shaner,* 172 F.3d 927, 930 (6th Cir.1999). Liability extends when the City's conduct is the " 'moving force' behind the constitutional violation." *Sova v. City of Mount Pleas-*

*ant,* 142 F.3d 898, 904 (6th Cir.1998) (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). The plaintiff " 'must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.' " *Gregory v. Shelby County,* 220 F.3d 433, 442 (6th Cir.2000) (quoting *Board of County Comm's of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

The City argues that it is not liable because Mr. Hoover did not allege that he was terminated, or that his due process rights were violated, pursuant to City policy or custom. The Plaintiff responds that there is evidence that the City and its Building Department engaged in denial of free speech as a practice. The Plaintiff contends that the City officials participated in, and permitted each Defendant's threats to fire Mr. Hoover for engaging in protected speech.

■ This Court finds, viewing the facts in the light most favorable to Mr. Hoover, that the City had a custom or policy of violating individuals' First and Fourteenth Amendment rights. As for the First Amendment, before Mr. Hoover allegedly pushed and verbally threatened Mr. Sheldon, Mr. Hoover was counseled for publically voicing his concerns with the Building Department and for publicly disagreeing with Mr. Sheldon. Furthermore, it was City officials, pursuant to the City's work rules, and not Mr. Sheldon, who terminated Mr. Hoover. The Sixth Circuit has found that a decision that is either "made or approved by a final policy-maker of the City . . . [is] sufficient to trigger municipal liability under Monell." *Meyers v. City of Cincinnati,* 14 F.3d 1115, 1117 (6th Cir.1994). Here, the Court finds, as a matter of law, that the actions of the Director of Public Safety, Ms. Droste, a final-policy maker for the City's Building Department, in terminating Mr. Hoover are sufficient to establish *Monell* liability.[8] *City of St. Louis v. Praprotnik,* 485 U.S.

---

8. It is notable that the individual who was

found to be a final policy-maker in *Meyers*

112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Fisher v. City of Cincinnati,* 753 F.Supp. 681, 688 (S.D.Ohio 1990). These facts are sufficient to establish a *Monell* claim and to demonstrate a causal connection between Mr. Hoover's assertion of his constitutional rights and the City's act of firing him. As for Mr. Hoover's due process claim, the City through its Notice, did not permit Mr. Hoover a pre-deprivation hearing or inform him of his right to appeal. The City's Motion is therefore **DENIED** with respect to the Plaintiff's claims against the City of Circleville.

### E. Public Policy

■ The Plaintiff also claims that the Defendants' actions constitute a public policy tort under Ohio law. In order "to state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a 'clear public policy.'" *Painter v. Graley,* 70 Ohio St.3d 377, 639 N.E.2d 51 (1994) (syllabus). The "clear public policy" can be based on sources such as statutes, the Constitutions of Ohio and the United States, administrative rules and regulations and the common law. *Painter,* 639 N.E.2d at 51 (syllabus); *see also Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653, 657–60 (1995).

Defendants argue that the Plaintiff cannot establish that he was terminated as a result of speech that was a matter of public concern, nor can he demonstrate that his speech was the motivating factor for his termination. In response, the Plaintiff argues that if his retaliation claim remains, so should his public policy claim.

As summary judgment has been denied on both of Mr. Hoover's claims of First Amendment retaliation and Fourteenth Amendment procedural due process, these claims serve as the basis for Mr. Hoover's claim of a violation of public policy under Ohio law. Summary judgment is therefore

was the City's Director of Safety. 14 F.3d at

**DENIED** on the Plaintiff's public policy tort claim.

### F. Conspiracy

■ Mr. Hoover's final claim is one of civil conspiracy by the Defendants. A claim of civil conspiracy is established by demonstrating: " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 700 N.E.2d 859, 868 (1998) (quoting *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (1995)). Civil conspiracy requires an "underlying unlawful act." *Williams,* 700 N.E.2d at 868. The combination "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis,* 116 Ohio App.3d 195, 687 N.E.2d 481, 496 (1996). Malice is defined as: " 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.' " *Williams,* 700 N.E.2d at 868 (quoting *Pickle v. Swinehart,* 170 Ohio St. 441, 166 N.E.2d 227, 229 (1960)).

Defendants argue that the Plaintiff has not established proof of conspiracy and has not shown malicious conduct by any of the Defendants or any unlawful acts committed. The Plaintiff responds that Ms. Droste, Mr. Starkey and Mayor Radabaugh discussed and decided to terminate Mr. Hoover. The Plaintiff argues that these acts constitute a combination of two or more persons, malicious intent and an injury.

■ First, malice can be found as Ms. Droste, Mr. Starkey and Mayor Radabaugh acted wrongfully and purposefully in terminating Mr. Hoover, although there exists a question of fact as to whether the act was without excuse. Two or more persons were involved, and there were ac-

1116.

tual damages. Finally, the termination could not have been lawfully committed by one person, supporting the element "in a way not competent for one alone." Based on the dispute of fact, summary judgment is **DENIED**.

## V. CONCLUSION

The Defendants' Motion for Summary Judgment is therefore **DENIED** in its entirety.

**IT IS SO ORDERED.**